No. 22-2771

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

DeShawn Drumgo

Plaintiff-Appellant,

v.

William Kuschel,

Defendant-Appellee,.

On Appeal From The United States District Court For The
District of Delawre
Case No. 1:14-cv-1135

### *AMICUS CURIAE* BRIEF OF RIGHTS BEHIND BARS IN SUPPORT OF APPELLANT

Samuel Weiss
Rights Behind Bars
416 Florida Avenue NW
Suite 26152
Washington, DC  20001
(202) 455-4399

*Counsel for Amicus Curiae*
*Rights Behind Bars*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICUS CURIAE* ....................................................... 3

INTRODUCTION .................................................................................. 3

ARGUMENT............................................................................................ 5

I.   CORRECTIONS OFFICERS KNOW THAT IT IS UNLAWFUL TO SEXUALLY HARASS OR ABUSE INCARCERATED PEOPLE, ESPECIALLY DURING STRIP SEARCHES ...................................... 5

    *A.   Courts Have Uniformly Held That the Eighth Amendment Prohibits Corrections Officers From Sexually Abusing Incarcerated People, Including During Strip Searches* ...................................................................... 5

    *B.   Sexual Abuse During Strip Searches Violates Professional Expectations and National Standards for Prisons and Jails.* ............................... 7

II.   SEXUAL ABUSE UNDERMINES INSTITUTIONAL SAFETY AND SECURITY. ....................................................................................... 9

III.  PRISONERS HAVE LITTLE RECOURSE AGAINST SEXUAL ABUSE BY CORRECTIONS OFFICERS. ................................................... 11

    *A.   Sexual Abuse by Corrections Officers Is All Too Common* ..................... 12

    *B.   Prisoners Who Report Sexual Abuse by Corrections Officers Often Face Retaliation.* ................................................................................. 14

CONCLUSION.......................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................................. 9

*Bearchild v. Cobban*, 947 F.3d 1130 (9th Cir. 2020)...........................7, 10

*Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015).................................7, 9

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................. 9

*Everson v. Mich. Dep't of Corr.*, 391 F.3d 737 (6th Cir. 2004) ........................... 17

*Farmer v. Brennan*, 511 U.S. 825 (1994)...........................................6, 12

*Graham v. Florida*, 560 U.S. 48 (2010) .................................................. 9

*Hayes v. Dahlke*, 976 F.3d 259 (9th Cir. 2020) .......................................... 7

*Helling v. McKinney*, 509 U.S. 25 (1993) ............................................... 12

*Hudson v. McMillian*, 503 U.S. 1 (1992)................................................ 4

*Kahle v. Leonard*, 477 F.3d 544 (8th Cir. 2007)......................................... 6

*Keith v. Koerner*, 843 F.3d 833 (10th Cir. 2016)..................................... 18

*Ricks v. Shover*, 891 F.3d 468 (3d Cir. 2018) .......................................... 7

*Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000)............................ 6

*Taylor v. Barkes*, 575 U.S. 822 (2015) ................................................. 4

*United States v. Bailey*, 444 U.S. 394 (1980) ........................................ 15

*Washington v. Hively*, 695 F.3d 641, 642–44 (7th Cir. 2012)................................ 7

*Watson v. Jones*, 980 F.2d at 1165 (8th Cir. 1992)................................ 17

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910
    (D.C. Cir. 1996)................................................................... 18

*Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012)...........................6, 14, 15

**Statutes**

34 U.S.C. § 30301 *et seq.*...........................................................8, 12, 15

34 U.S.C. § 30302(7) .......................................................................... 8

34 U.S.C. § 30309(9) .......................................................................... 9

34 U.S.C. § 30307(e)(2). ..................................................................... 9

**Other Authorities**

Am. Corr. Ass'n, *Performance-Based Expected Practices for Adult Correctional Institutions* § 5-3D-4281-6 (5th ed. 2018) ........................................... 8

Bureau of Justice Statistics, *PREA Data Collection Activities* (June 2018), https://bjs.ojp.gov/content/pub/pdf/pdca18.pdf ................................... 12

Cheryl Bell et al., *Rape and Sexual Misconduct in the Prison System: Analyzing America's Most "Open" Secret*, 18 Yale L. & Pol'y Rev. 195 (1999) ......... 12, 13

Cindy Struckman-Johnson & David Struckman-Johnson, *Sexual Coercion Rates in Seven Midwestern Prison Facilities for Men*, 80 Prison J. 379 (2000) .............. 15

Fed. Bureau of Prisons, *Program Fact Sheet* (May 31, 2019), https://www.bop.gov/about/statistics/docs/program_fact_sheet_201907.pdf .... 11

Jeffrey Ian Ross, *Deconstructing Correctional Officer Deviance: Toward Typologies of Actions and Controls*, 38 Crim. Just. Rev. 110, 114 (2013) ........ 14

John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, 22 Wash. U. J.L. & Pol'y 385, 515 (2006) ...................................................... 14

Kim Shayo Buchanan, *Our Prisons, Ourselves: Race, Gender, and the Rule of Law*, 29 Yale L. & Pol'y Rev. 1, 24 (2010) ...................................... 13

Kitty Calavita & Valerie Jenness, *Appealing to Justice: Prisoner Grievances, Rights, and Carceral Logic* 68 (2015) .............................................. 14

M. Keith Chen, *Do Harsher Prison Conditions Reduce Recidivism? A Discontinuity-Based Approach*, 9 Am. L. & Econ. Rev. 1 (2007) ..................... 10

Megan Coker, Note, *Common Sense About Decency: Promoting a New Standard for Guard-on-Inmate Sexual Abuse Under the Eighth Amendment*, 100 Va. L. Rev. 437 (2014) ................................................................. 10

Ramona R. Rantala et al., Bureau of Justice Statistics, *Survey of Sexual Violence in Adult Correctional Facilities, 2009-11 Statistical Tables* 1 (Jan. 2014), https://bjs.ojp.gov/content/pub/pdf/ssvacf0911st.pdf ........................................ 12

Robert W. Dumond, *Impact of Prisoner Sexual Violence: Challenges of Implementing Public Law 108-79 The Prison Rape Elimination Act of 2003*, 32 J. Legis. 142 (2006) .......................................................... 14

United Nations Off. On Drugs & Crime, *Handbook for Prison Leaders* 34 (United Nations 2010), https://www.unodc.org/documents/justice-and-prison-reform/UNODC_Handbook_for_Prison_Leaders.pdf .................................10, 11

**Regulations**

28 C.F.R. § 115.11 *et seq* .....................................................................8, 9

## INTEREST OF *AMICUS CURIAE*[1]

Rights Behind Bars (RBB) legally advocates for people in prison to live in humane conditions and contributes to a legal ecosystem in which such advocacy is more effective. RBB seeks to create a world in which people in prison do not face large structural obstacles to effectively advocating for themselves in the courts. RBB helps incarcerated people advocate for their own interests more effectively and through such advocacy push towards a world in which people in prison are treated humanely.

## INTRODUCTION

DeShawn Drumgo filed a complaint *pro se* alleging that while incarcerated, a correctional officer, William Kuschel, sexually assaulted him without provocation by grabbing and squeezing his penis. A51. On two separate occasions, the district court dismissed Drumgo's claims; each time, this Court reversed on behalf of Drumgo, still proceeding *pro se*. A178–A185; A295–A308. After these two reversals and eleven written requests for counsel, the district court appointed Drumgo counsel. Op. Br. 4. After a two-day trial, a jury returned a verdict for Drumgo and awarded him $500,000 in punitive damages. A375–A377. The district

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity other than *amicus* or their counsel has made a monetary contribution to the preparation or submission of this brief. Appellant consented to *amicus*'s submission of this brief and Appellee noted no position.

court held that punitive damages of $500,000 violated Kuschel's constitutional rights, as would any award over $5,000. A3–A27. In so deciding, the district court made the policy claim that failing to override the jury's decision would "dissuade correctional officers from conducting searches they would otherwise perform and lead to the introduction of weapons and contraband into Delaware's prisons. It will also deter competent professionals from seeking out correctional officer positions. All told, allowing a $500,000 punitive award to stand will result in increased security risks in an already dangerous environment." A21–A22.

*Amicus Curiae* believe that this policy analysis is both wrong and troubling. As a preliminary matter, any plaintiff has to both meet an extremely onerous Eighth Amendment standard and overcome the defense of qualified immunity before receiving a cent of damages. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (explaining that a plaintiff must show that prison officials "maliciously and sadistically use[d] force to cause harm"); *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (explaining in the prison context that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law). By the time a plaintiff has done both, the policy concerns of the district court are no longer valid and, indeed, cut in favor Drumgo.

*Amicus* writes to make three brief points: 1) there is no gray area between valid searches and sexual assaults, and correctional officers are trained as to which

is which. Large damages awards for victims of sexual assaults will not dissuade the vast majority of current or prospective prison guards who have no intention of engaging in such conduct. 2) Holding perpetrators of sexual assault liable does not undermine but instead is essential for security, which relies on trust and accountability between incarcerated people and staff. Finally, 3) there already exist enormous obstacles for prisoners to report sexual assault—this Court should not countenance the district court's addition to them.

## ARGUMENT

### I. CORRECTIONS OFFICERS KNOW THAT IT IS UNLAWFUL TO SEXUALLY ABUSE INCARCERATED PEOPLE, ESPECIALLY DURING STRIP SEARCHES.

The district court expressed fear that the jury's damages award would prevent officials from executing legitimate searches or even from becoming prison guards in the first place. This anxiety suggests that there is some ambiguity about the difference between a search and sexual assault that could cause a prison official, acting in good faith, to accidentally incur significant liability. No such gray area exists, either in constitutional doctrine or in practice. Correctional officers understand the difference between sexual assault and the legitimate exercise of their jobs.

### A. Courts Have Uniformly Held That the Eighth Amendment Prohibits Corrections Officers From Sexually Abusing Incarcerated People, Including During Strip Searches.

Precedent across the circuits both before and after the alleged abuse occurred unequivocally establishes that corrections officers are not permitted to intentionally fondle prisoners' genitalia. "[S]exual contact between a prisoner and a prison guard serves no legitimate role and 'is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted)). As the Ninth Circuit stated fifteen years before this incident occurred: "In the simplest and most absolute of terms, the Eighth Amendment rights of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000). And the Eighth Circuit held in 2002 that "no reasonable prison official … could have concluded … that a detainee who was sexually assaulted by a prison guard did not suffer a 'serious harm.'" *Kahle v. Leonard*, 477 F.3d 544, 553 (8th Cir. 2007).

Courts have thus consistently held that the Eighth Amendment protects against sexual abuse by corrections officers, with many of the incidents underlying the cases occurring during pat-down searches or strip searches. *See, e.g.*, *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) ("A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no

penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment."); *Ricks v. Shover*, 891 F.3d 468, 471 (3d Cir. 2018) ("Our society requires prisoners to give up their liberty, but that surrender does not encompass the basic right to be free from severe unwanted sexual contact."); *Washington v. Hively*, 695 F.3d 641, 642–44 (7th Cir. 2012) (holding that "gratuitously fondling" the plaintiff for "five to seven seconds … through the plaintiff's clothing" and for "two or three seconds" while strip searching him violated the Eighth Amendment); *Bearchild v. Cobban*, 947 F.3d 1130, 1146 (9th Cir. 2020) ("We … reaffirm … that sexual assault violates the Eighth Amendment regardless of the amount of force used."); *Hayes v. Dahlke*, 976 F.3d 259, 275 (9th Cir. 2020) ("[T]he routine nature of these pat frisks alone does not shield an officer from liability, and the conduct described by [the plaintiff], if believed, could certainly support an inference that [the defendant] engaged in conduct beyond what was required for a pat search.").

## B. Sexual Abuse During Strip Searches Violates Professional Expectations and National Standards for Prisons and Jails.

Sexual abuse of the sort perpetrated by Kuschel has no place in a carceral setting under any circumstances. Correctional officials have established high professional standards for themselves and their staff. As a member of the profession, Paul was unquestionably aware that his conduct was unlawful.

The standards promulgated by the nation's leading correctional organization, the American Correctional Association, address the professional expectations set for correctional staff. The ACA Standards require facilities to implement written policies and procedures that prohibit "sexual conduct between staff and inmates" and subject violators to "administrative and criminal disciplinary sanctions."[2] The ACA Standards similarly require facilities to implement policies and procedures that "clearly indicate[] that sexual harassment, either explicit or implicit, is strictly prohibited."[3]

Congress unanimously passed the Prison Rape Elimination Act ("PREA") in 2003, 34 U.S.C. § 30301 *et seq.*, and the Attorney General promulgated a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape in 2012, 28 C.F.R. § 115.11 *et seq.* The significance of PREA and the PREA Standards cannot be overstated. Congress had never before passed national standards for prisons and jails. And to this day the PREA Standards remain the only national legal standards regulating prisons and jails in this country. PREA's very text notes that its purpose is to "protect the Eighth Amendment rights of Federal, State, and local prisoners." 34 U.S.C. § 30302(7). The Eighth Amendment requires courts to "look beyond historical conceptions to 'the evolving standards of decency

---

[2] Am. Corr. Ass'n, *Performance-Based Expected Practices for Adult Correctional Institutions* § 5-3D-4281-6 (5th ed. 2018).
[3] *Id.* § 5-1C-4056.

that mark the progress of a maturing society.'" *Graham v. Florida*, 560 U.S. 48, 58 (2010) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). As a unanimously passed legislative enactment, PREA is the "clearest and most reliable objective evidence of contemporary values." *Crawford*, 796 F.3d at 260 (quoting *Atkins v. Virginia*, 536 U.S. 304, 315 (2002)); *see also Bearchild*, 947 F.3d at 1144.

PREA defines rape to include sexual fondling. 34 U.S.C. § 30309(9). Sexual fondling "means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification." *Id.* § 30309(11). The PREA Standards prohibit sexual abuse by staff. All prisons must comply with the PREA Standards or risk losing federal funding, which all state prison systems receive. *Id.* § 30307(e)(2). The PREA Standards set a "zero tolerance" policy "towards all forms of sexual abuse and sexual harassment." 28 C.F.R. § 115.11. In relevant part, the PREA Standards prohibit "intentional contact, either directly or through the clothing, of or with the genitalia …, that is unrelated to official duties." *Id.* § 115.6. Kuschel's conduct therefore falls squarely within the list of acts that these national standards sought to eliminate.

## II.   SEXUAL ABUSE UNDERMINES INSTITUTIONAL SAFETY AND SECURITY.

The district court based its ruling in part on its conclusion that "allowing a $500,000 punitive award to stand will result in increased security risks in an already dangerous environment." A22. This invocation of security concerns, without citation

to precedent or any empirical evidence, gets the evidence on this subject backwards..

Permitting sexual assault by prison staff makes prisons more dangerous, not less.

Behavior like Kuschel's undermines the creation of a safe environment for rehabilitation and undermines institutional security and safety. Searches are vulnerable moments when prisoners are subject to a corrections officer's intrusive physical touch. Corrections officers are government agents tasked with protecting the health and safety of the people in their custody.[4] To take advantage of that role by abusing a person forced to succumb to an invasion of their bodily privacy undermines the educational and rehabilitative goals of carceral institutions.[5]

Sexual harassment and abuse also damage corrections' officers' ability to keep order and uphold their "duty under the Eighth Amendment … to ensure 'reasonable safety.'" *Farmer*, 511 U.S. at 844 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). By design, a limited number of staff members are tasked with

---

[4] Megan Coker, Note, *Common Sense About Decency: Promoting a New Standard for Guard-on-Inmate Sexual Abuse Under the Eighth Amendment*, 100 Va. L. Rev. 437, 438 (2014).

[5] United Nations Off. On Drugs & Crime, *Handbook for Prison Leaders* 34 (United Nations 2010), https://www.unodc.org/documents/justice-and-prison-reform/UNODC_Handbook_for_Prison_Leaders.pdf ("The objective of imprisonment is to respectfully perform the sentence passed by the Court, and facilitate the rehabilitation of prisoners so as to prepare them for their return to society."); *see also* M. Keith Chen, *Do Harsher Prison Conditions Reduce Recidivism? A Discontinuity-Based Approach*, 9 Am. L. & Econ. Rev. 1, 24 (2007) (arguing harsher prison conditions increase recidivism).

supervising large numbers of incarcerated people.[6] Developing rapport with the incarcerated population is critical to maintaining safety and security under these circumstances. Good rapport is necessary to facilitate communication with incarcerated people and to encourage them to report problems and concerns to the staff. Corrections officers can develop that rapport only by fairly and consistently treating all people in the facility with dignity. Sexual abuse like the behavior proven here actively thwarts the sound management of the entire institution by reducing trust in staff and discouraging incarcerated people from reporting violence or other problems. Finally, officers have a duty to model the behavior and respect expected from people who are incarcerated. When officers abuse or harass incarcerated people, the officers fail to fulfill this duty, and instead set a negative example for other prisoners to engage in similarly abusive behavior.[7]

## III. PRISONERS HAVE LITTLE RECOURSE AGAINST SEXUAL ABUSE BY CORRECTIONS OFFICERS.

Sexual abuse occurs all too frequently in American prisons and jails. The judiciary should take every opportunity to condemn sexual abuse committed by

---

[6] *See* Fed. Bureau of Prisons, *Program Fact Sheet* (May 31, 2019), https://www.bop.gov/about/statistics/docs/program_fact_sheet_201907.pdf (noting inmate-to-correctional-officer ratio of 9.3 to 1 in federal prisons).

[7] *See* United Nations, *supra* note 5, at 34 ("The prison system must show by example how people should be treated; by treating prisoners fairly and humanely and demonstrating respect for their rights, one can hope that prisoners will learn how to treat others from that example.").

corrections officers. Federal law unequivocally prohibits the type of conduct that Drumgo endured, and corrections officers who violate it should be held accountable. Reversing the district court would further establish the federal courts' conclusion that officers who abuse incarcerated people they are charged with protecting should face appropriate consequences.

**A. Sexual Abuse by Corrections Officers Is All Too Common.**

Pervasive sexual misconduct in correctional facilities has been described as "America's most open secret."[8] When it enacted PREA in 2003, Congress found that "[t]he total number of inmates who have been sexually assaulted in the past 20 years likely exceeds 1,000,000." 34 U.S.C. § 30301(2). In 2018, corrections officials nationwide reported 24,661 allegations of sexual abuse in carceral facilities.[9] And in 2011, corrections officers committed approximately half (252 out of 546) of all substantiated allegations of sexual victimization reported by federal and state prison authorities.[10]

It is particularly repugnant when a corrections officer, who controls nearly every aspect of a prisoner's life, engages in the sexual abuse of a prisoner. Because

---

[8] Cheryl Bell et al., *Rape and Sexual Misconduct in the Prison System: Analyzing America's Most "Open" Secret*, 18 Yale L. & Pol'y Rev. 195, 196 (1999).

[9] Bureau of Justice Statistics, *PREA Data Collection Activities, 2018*, at 1 (June 2018), https://bjs.ojp.gov/content/pub/pdf/pdca18.pdf.

[10] *See* Ramona R. Rantala et al., Bureau of Justice Statistics, *Survey of Sexual Violence in Adult Correctional Facilities, 2009-11 Statistical Tables* 1, 7 (Jan. 2014), https://bjs.ojp.gov/content/pub/pdf/ssvacf0911st.pdf.

of the extreme "dichotomy of control between prison guards and prisoners," corrections officers should be held to a high standard when it comes to sexual abuse of prisoners. *See Wood*, 692 F.3d at 1047. Prisoners "cannot choose what or when to eat, whether to turn the lights on or off, where to go, and what to do. They depend on prison employees for basic necessities, contact with their children, health care, and protection from other inmates." *Id.* Such power imbalances between prisoners and corrections officers often make it difficult to hold staff accountable; prisoners often lack effective access to courts, leaving prison officials to serve as police, prosecution, jury, and courts of appeals.[11]

Even where corrections officers do not directly perpetrate sexual abuse, they may deliberately ignore it. As Justice Blackmun observed over forty years ago, "[p]rison officials either are disinterested in stopping abuse of prisoners … or are incapable of doing so, given the limited resources society allocates to the prison system." *United States v. Bailey*, 444 U.S. 394, 421 (1980) (Blackmun, J., dissenting). Robust enforcement by the courts and adequate oversight by prison and jail administrators is critical to ensuring custodial sexual abuse is not accepted as an inevitable reality.[12]

---

[11] Kim Shayo Buchanan, *Our Prisons, Ourselves: Race, Gender, and the Rule of Law*, 29 Yale L. & Pol'y Rev. 1, 24 (2010) ("Since prisoners lack effective access to the courts, prison officials serve as police, prosecutor, judge, jury, and court of appeals.").

[12] *See* Bell, *supra* note 8, at 196, 215–16.

13

## B. Prisoners Who Report Sexual Abuse by Corrections Officers Often Face Retaliation.

Actual or threatened retaliation by corrections officers often compounds the harm inflicted by sexual abuse and impedes efforts to hold officers accountable. Abusive corrections officers may retaliate against prisoners who refuse their sexual advances or report their conduct.[13] One survey suggests that "more than half of prisoners who file grievances report experiencing retaliation for making a complaint against staff."[14] In another study, 61% of prisoners reported that concerns about retaliation by corrections officers deterred them from filing grievances.[15] That study found that prisoners "often endure abuse by guards in order not to jeopardize their release date."[16] Another researcher said that "[m]ost prison sexual assault victims do not report the incidents to correctional authorities, because they fear reprisals, fear

---

[13] *See* Robert W. Dumond, *Impact of Prisoner Sexual Violence: Challenges of Implementing Public Law 108-79 The Prison Rape Elimination Act of 2003*, 32 J. Legis. 142, 149 (2006) (stating corrections officers may resort to blackmail, pressure tactics, physical force, and/or psychological manipulation if their advances are refused); Jeffrey Ian Ross, *Deconstructing Correctional Officer Deviance: Toward Typologies of Actions and Controls*, 38 Crim. Just. Rev. 110, 114 (2013) (discussing that corrections officers "have a considerable amount of power while on the job and can take a litany of retaliatory acts against them if they choose").

[14] John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*, 22 Wash. U. J.L. & Pol'y 385, 515 (2006).

[15] Kitty Calavita & Valerie Jenness, *Appealing to Justice: Prisoner Grievances, Rights, and Carceral Logic* 68 (2015).

[16] *Id.* at 69.

14

no one will believe them, or think it will only cause more problems."[17] Further, "sexual assault is likely to be underreported by male inmates because of ... unwillingness to be a 'snitch,' and fear of being labeled a homosexual or weak."[18] Courts have also recognized a pattern of retaliation against prisoners who report staff sexual abuse. *See, e.g.*, *Watson v. Jones*, 980 F.2d 1165, 1166 (8th Cir. 1992) (reversing summary judgment for a corrections officer who allegedly "fondled [plaintiffs] during pat-down searches" and who "retaliated" against them "when they refused to be searched by [her]."); *see also Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 741 (6th Cir. 2004); *Keith v. Koerner*, 843 F.3d 833, 852 (10th Cir. 2016); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 931 (D.C. Cir. 1996). Because of the widespread fear of retaliation, "[p]rison rape often goes unreported." 34 U.S.C. § 30301(6). And when staff sexual abuse goes unreported, officers are not held accountable.

Drumgo risked such retaliation by raising the allegations in his complaint and carrying them all the way through to trial. Because of his brave decision to report what happened, this Court has the opportunity to condemn the sexual abuse by Kuschel, which is emblematic of the sexual abuse happening in prisons and jails

---

[17] Dumond, *supra* note 13, at 154.

[18] Cindy Struckman-Johnson & David Struckman-Johnson, *Sexual Coercion Rates in Seven Midwestern Prison Facilities for Men*, 80 Prison J. 379, 380 (2000).

across the nation. Securing a remedy for Drumgo may deter other corrections officers from committing similar abuses.

## CONCLUSION

This Court should reverse the district court's order reducing Drumgo's damages award by 99%.

Date: April 17, 2023                  Respectfully submitted,


                                      */s/ Samuel Weiss*

                                      Samuel Weiss
                                      RIGHTS BEHIND BARS
                                      416 Florida Avenue NW, #26152
                                      Washington, DC 20001


                                      *Counsel for amicus curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 3,173 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Date: April 17, 2023

*/s/ Samuel Weiss*
Samuel Weiss

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing amicus curiae brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: April 17, 2023

*/s/ Samuel Weiss*
Samuel Weiss